MAXWELL v. STATE.

Criminal 4587                                    225 S. W. 2d 687

Opinion delivered January 9, 1950.

*W. Harold Flowers, E. V. Trimble* and *L. Clifford Davis*, for appellant.

*Ike Murry*, Attorney General, and *Arnold Adams*, Assistant, for appellee.

GRIFFIN SMITH, Chief Justice.   Appellant is a Negro twenty years of age.   By information the State charged that on July 20th, 1949, he raped Mrs. Walter Nichols, a white woman whose husband was a plantation tenant residing south of Hope near Highway 29.   The crime is alleged to have occurred shortly after eight o'clock in the morning while Mrs. Nichols was otherwise alone. Her testimony was that Herman stopped by the house,

tapped lightly at the front porch, and asked for a drink of water. He made incidental inquiries and went away, but shortly returned and requested matches.

Substance of Mrs. Nichols' testimony from this time is that the caller, whom she had not formerly known, demanded in an insinuative manner whether she "had anything for him". Her indignant "No" was followed by the Negro's aggressive act in coming onto the porch after she had asked him several times to go away. As she withdrew into the house Herman followed, an open knife in his right hand. Through fear she did not make an outcry. Herman's actions were accompanied with the remark, "I came here for something and I am going to get it before I leave". Mrs. Nichols was pushed to a bed where the rape took place while Herman held the knife in a threatening position, saying he would use it if an outcry should be made. He also threatened to kill her if others were later told what had happened.

Appellant, while admitting the sexual act, insisted that he had been repeatedly solicited. On at least three occasions before July 20th Mrs. Nichols, he said, had broached the subject of copulation, but he told her he was afraid to have such relations with a white woman. On the day in question Mrs. Nichols called as he passed the house and asked if he had "thought it over—about having sexual intercourse with a white woman if you had a chance?" She then told him that if he didn't consent "I will scream, and the house will be surrounded". In these circumstances, and through fear of what might happen if Mrs. Nichols should falsely accuse him, he consented.

The jury did not believe this story of enticement, but chose to accept the explanations made by Mrs. Nichols; and the evidence was sufficient to sustain the conviction.

The controlling question before us, however, is not one of evidence, although an understanding of the factual background is helpful in determining whether

appellant's motion for a continuance ought to have been granted.

The defendant was arrested seven or eight hours after he left the Nichols home. Because of public resentment in Hempstead County he was taken to a jail elsewhere and kept until August 4th. Then a certified copy of the information was served on him in the courthouse at Hope. The record indicates that he was again taken out of the county, but was brought back two days later for arraignment. Being unable to pay for legal services, the accused was offered and impliedly accepted counsel by appointment. Six members of the local bar were asked to represent him: Lyle Brown, Albert Graves, W. S. Atkins, John P. Vesey, John L. Wilson, Jr., and Talbot Field, Jr. Trial was set for Monday, August 8th. The attorneys when appointed petitioned for an order committing the defendant to State Hospital for observation and examination, stating that the defense of insanity would be interposed.

In denying the request for commitment, the Court also appointed Doctors Don Smith, G. E. Cannon, J. G. Martindale, L. M. Lile, J. W. Branch, Jim McKenzie, and George H. Wright, to determine whether there were reasonable grounds for believing the prisoner to be insane. Act 256, approved March 8, 1949. The order required these physicians—none of whom qualified as a psychiatrist or mental expert—to make their report at nine o'clock Monday morning. All joined in a certificate dated Sunday, August 7th, finding the subject sane, or as it was expressed, "without psychosis".

In their motion for continuance—all concurring— the attorneys urged that insufficient time had been allowed for preparation. They did not, until mid-morning Saturday, know that the Court had appointed them for the defense. Presumptively the motion was drafted Saturday afternoon or Sunday—although filing date is the 8th—for it recites that the physicians had not reported on the sanity tests.

Urged as justification for continuance was the impracticability of interviewing the prisoner, who could

not be seen without a four-hour notice to the peace officers. On Sunday morning these custodians informed counsel that Herman could be seen at three o'clock that afternoon. The resulting conference lasted two hours, ending at five o'clock.

It is alleged in the motion that the defendant persisted in his claim that relations with Mrs. Nichols were invited, thus contradicting published reports of a voluntary confession. Other than the time employed on Sunday, the only opportunity for preparation was from late Saturday until that day ended, "consisting of a few daylight hours"; therefore, urged the attorneys, "In order to give the defendant the defense to which he is entitled, it will be necessary to interview a number of witnesses in Hempstead County, one or two witnesses in Logan County, [also] to check certain records in this county, and to make a detailed study of the area surrounding the scene of the alleged crime, since the movements of the defendant before and after his presence at the home of the prosecuting witness are vitally important".

An additional ground for continuance, urged defending counsel, was pregnancy of the prosecuting witness, who expected to be delivered of child early in September.[1] Argument was that the delicate situation created by a combination of alleged rape and preëxisting pregnancy would hinder vigorous cross-examination; or, conversely, if full justice in this respect should be done the defendant by subjecting the prosecuting witness to protracted examinations, nervous reaction might impair her health, cause a miscarriage, or affect the child's physical status. Medical testimony on this issue did not sustain the points, hence the Court correctly ruled against the so-called hazards.

. . . . . . . .

In felony cases it is the Attorney General's duty to present the State's belief, when he is so convinced, that

---

[1] Inferences deducible from assertions in the motion, and from testimony given by Mrs. Nichols, point to conception some time before Mrs. Nichols married her present husband. She first married James Russell in 1945, but they separated and were divorced in December, 1947. The marriage to Nichols occurred March 21, 1949, and, [cross-examination] "I expect the baby on the first of September".

the appeal record does not contain reversible errors. Here there is reliance on some of our own decisions that unverified motions for postponement are properly overruled. Again, it is generally held that a defendant's claim that he needs a witness—one who is not named—will not be favorably considered unless it is shown that the witness is within the court's jurisdiction, or can be procured. In such cases substance of the testimony and its relevancy must be brought to the Court's attention. *Smith* v. *State,* 181 Ark. 592, 26 S. W. 2d 899; *Brickey* v. *State,* 148 Ark. 595, 231 S. W. 549. We do not impair these holdings. Nor are we unmindful of the trial Court's difficult position. The Judge was asked to continue until the regular October term, while at the same time it was shown that the prosecutrix—if the child's birth should be "late", as so frequently occurs—might not be available to testify. It is convincingly shown that public hostility to the defendant made prudent procedure imperative. The Court, therefore, had to deal with realities as they were found. That Judge Bush honestly thought that nothing of advantage to the accused would be gained by delay, except the value of abstract time, there is little doubt; hence his action in expediting the trial is not to be criticized, notwithstanding our conclusions in mature review that the motion ought to have been granted.

The six lawyers designated for the defense are representative of the State's best talent. None anticipated appointment, and not one desired it. Some were so busily engaged Saturday in professional or official duties that they could not meet for consultation until late in the day.[2] The trial Judge, in some of his statements, recognized the limitations that were being imposed; and he did not, when the unverified motion was presented, overrule it for want of formality. But even this defect, 'though not then an issue, was cured when Talbot Field, Jr., as a sworn witness in respect of the motion, said that he believed the factual allegations were true.

---

[2] Lyle Brown, one of the attorneys, is Mayor of Hope. John P. Vesey, another defense lawyer, was City Attorney.

But primarily the Court was confronted with reputable attorneys who had no choice but to recognize, first, that the law was dealing with the life of a colored man for whose right to be heard regarding reasonable extenuations they were responsible, while secondly, as an arm of the Court, the State's dignity and society's welfare had to be maintained. They carefully balanced these considerations, then in all earnestness told the Court that they could not appropriately defend the prisoner without knowing more about the case.

Our Constitution, Art. 2, § 10, says that one accused criminally shall enjoy the right to a speedy and public trial. The guarantee has sometimes been cited in justification of the public's right to have its laws administered without injurious delays. But the fundamental purpose was to expedite adjudications so that none could fairly say that the right to an acquittal was being stifled because those charged with official duties preferred to procrastinate, meanwhile keeping the accused under a cloud—a result as severe in some cases as conviction would be in others.

Our trial Courts usually show sound judgment in requiring speedy disposal of criminal charges; but sometimes, as here, the very fact of well-intentioned dispatch injures the judicial process, though every conscious intent be otherwise.

Reversed, with directions that the cause be retried.

Mr. Justice McFADDIN and Mr. Justice DUNAWAY did not participate in the consideration or determination of the appeal.